UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PHARMACIA CORPORATION | ) | |
| SUPPLEMENTAL PENSION PLAN, | ) | |
| BY AND THROUGH ITS PLAN | ) | |
| ADMINISTRATOR, and PFIZER INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14CV1498 CDP |
| | ) | |
| VIRGINIA V. WELDON, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

Plaintiffs Pharmacia Corporation Supplemental Pension Plan and Pfizer, Inc.

allege that defendant Virginia V. Weldon should be required to reimburse them for

more than $1.3 million in pension distributions that they mistakenly paid to her.

When Weldon retired she elected to receive her pension benefits in set monthly

payments over a period of three years. In 2006, after the plan benefits had been

fully paid over the specified three years, the monthly payments continued to arrive.

Weldon and her financial advisor brought the payments to the attention of a

company the Plan had contracted with to address, among other things, customer

questions about pension payments. A representative for that company assured

them that the ongoing payments were correct and that Weldon was entitled to the

money.  The Plan ultimately stopped making the mistaken payments in 2009.  The Plan and Pfizer brought this suit almost five years later, in 2014, asserting a variety of claims under ERISA and state law.

Weldon has filed a motion to dismiss and a motion for summary judgment, both of which seek to dismiss all of plaintiffs' claims.  In her motion to dismiss, Weldon argues that plaintiffs' ERISA claims fail because they seek legal, not equitable, relief, and that the state-law claims are preempted by ERISA.  In her summary judgment motion, Weldon asserts that plaintiffs failed to file their lawsuit within the applicable statutes of limitation and that the affirmative defense of laches should apply to bar their claims.  I conclude that the Plan's ERISA claims for restitution and unjust enrichment (Counts 3 and 4) survive to the extent they seek to recover specifically identifiable funds (or the traceable proceeds of such funds) in Weldon's possession and control.   I will dismiss all other claims brought by the Plan and all claims brought by Pfizer because they seek relief not allowed by ERISA or they assert state-law claims that are preempted by ERISA.  I will deny the summary judgment motion because genuine disputes of material fact remain as to when the cause of action accrued, and whether plaintiffs' delay in bringing their claims was unreasonable.

# I.　**Background**

The Plan is an employee benefit plan that the parties agree is governed exclusively by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq*.  Pfizer is the current plan sponsor.  Weldon is a retired medical doctor who joined Monsanto Company in 1989.  As a Monsanto executive she participated in two pension plans.  One was the Monsanto Company Supplemental Retirement Plan.  The other plan, whose benefits are at issue in this lawsuit, was the Monsanto Company ERISA Parity Pension Plan (Parity Plan).  Through a series of corporate changes, Weldon's Monsanto business unit ultimately became a part of Pfizer, Inc., and her two pension plans merged with each other and one or more other plans to become the Plan that is a plaintiff in this lawsuit.

In 2004, Pfizer entered into an "Outsourcing Services Agreement" with Fidelity Employer Services Company, LLC.  Under this agreement, Fidelity was charged with providing "ministerial recordkeeping and administration services" for various Pfizer-sponsored retirement and health and welfare plans, including the Plan.  The agreement states that Pfizer is the Plan sponsor and Pfizer, or a committee as provided for in each plan document, is the Plan administrator.

The Agreement[1] indicates Fidelity was to act as the "checkwriter" for pension payroll payments, was responsible for informing participants of overpayments and requesting repayment, and was responsible for supporting direct deposit of periodic and lump sum payments and answering questions regarding pension check disbursement. (Plf. Ex. A-2, Doc #60-2, at 24, 26). Fidelity was to perform its services "within the framework of Plan provisions, guidelines and interpretations" as conveyed by Pfizer to Fidelity. (Plf. Ex. A-1, Doc. #60-1, at 6). The agreement states Fidelity would have "no discretionary authority or power to make any decisions as to plan policy, interpretations, practices or procedures…." (*Id*.). However, the "manner and means of performing the Services" were to be within Fidelity's exclusive control. The agreement states that the parties expressly deny, and that the agreement is not intended to create, a relationship of principal and agent between Pfizer and Fidelity. (*Id*. at 7).

According to the Agreement, Fidelity was to conduct audits to prevent duplicate payments/overpayments. (*Id*. at 26). It agreed to utilize "hrSource benefits specialists" as its "[b]randing" and would respond to customer telephone calls at the number 1-866-4SOURCE (4768723). (*Id*. at 96). All data transferred

---

[1] In Schedule E to the outsourcing agreement, the Pharmacia Corporation Supplemental Pension Plan is listed as a Defined Benefit Plan. Therefore, most of the provisions discussed here are taken from sections of the agreement specifically related to Defined Benefit Plans or from sections that were generally applicable to all plans.

to Fidelity or generated by Fidelity in the course of performing services for Pfizer remained the property of Pfizer. (Plf. Ex. A-1, Doc #60-1, at 14).

Weldon retired from Monsanto in 1999 and elected to defer payment of her pension benefits until 2003. Her benefit election form, which was executed in 1999, indicates that she opted to be paid for a term certain of three years following her deferral period. Her monthly benefits payments began as expected in January 2003. From 2003 to the end of 2005, Weldon received two monthly payments, one for each of the original two pension plans she participated in (despite those two plans supposedly merging in 2005). Although both payments were supposed to stop after December 2005, the payments on Weldon's Parity Plan continued through September 2009. After tax withholding, the net amount of each monthly payment for the Parity Plan was $20,141. Although the monthly payments were directly deposited into Weldon's account, each month she received a direct deposit written confirmation statement reflecting that month's payment.

After receiving the payments in January and February 2006, Weldon and her financial advisor, Diane Compardo, called the telephone number provided on the monthly direct deposit confirmations and spoke with a representative named Patty McGuire. McGuire was an employee of Fidelity, and the number Weldon reached her at was the same customer service telephone number provided in the outsourcing services agreement between Pfizer and Fidelity. The call was

recorded by Fidelity, so there is no dispute about exactly what was said. McGuire asked Weldon to confirm which plan she was calling about by stating the amount of the most recent monthly payment. Weldon then asked how many more payments she could expect on that plan. McGuire put Weldon and Compardo on hold while she went to review the plan documents in order to answer Weldon's question. When McGuire returned to the phone, she stated "I just wanted to verify that it is the Key Executive Pension that we're talking about. The Non-Qualified Pension that you had with Pharmacia?" Weldon and Compardo responded affirmatively. McGuire then told Weldon she had taken out a Single Life Annuity and that payments would "go for the remainder of [her] life." In reliance on McGuire's representation that she would continue to receive monthly payments, Weldon made "even larger" contributions to charitable institutions in the following years. Since January 1, 2006, Weldon has contributed $2,228,576 to charitable institutions and institutions of higher education.

More than three years after the phone call between Weldon and McGuire, in September 2009, Fidelity was working on a reconciliation project between its historical records system and its disbursement system. During the course of this project Fidelity discovered that Weldon's benefit payments had mistakenly been paid to her since January 2006. Fidelity notified Pfizer employee Lisa Marie

Misertino.  Misertino instructed Fidelity to stop all future benefit payments to Weldon.

In the same month, and soon after Fidelity's discovery, Weldon received a letter from hrSource regarding the "Pharmacia Supplemental Pension Plan, 'the Supplemental Plan,'" notifying her that payments on this plan should have been stopped in December 2005.  The letter stated she would be contacted soon about the amount and recovery of the overpayment.  In late October 2009, Weldon received a letter from Cathy A. Wilkins of hrSource regarding "Pharmacia Supp. Pension Plan plus CB, 'the Non-Qualified Plan.'"  This letter notified her that she had received an overpayment of $1,329,455.70 that needed to be returned to Pfizer. In December 2009 Weldon received another letter from Wilkins regarding "Pharmacia Supp. Pension Plan plus CB, 'the Non-Qualified Plan'" informing her that the letter would serve as her final notification that she must return the overpayment to Pfizer.  Additional letters regarding the overpayments were exchanged between Fidelity representatives and Weldon's attorney in 2010 and 2011.  There was no communication between the parties in 2012.  In early 2013, additional letters were exchanged between Weldon's counsel and Pfizer's counsel. This lawsuit was filed in August 2014.

## II.    Legal Standards

### A.    Motion to Dismiss

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint. When considering a 12(b)(6) motion, the court assumes the factual allegations of a complaint are true and construes them in favor of the plaintiff. *Neitzke v. Williams*, 490 U.S. 319, 326–27 (1989).

Rule 8(a)(2), Fed. R. Civ. P., provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." In *Bell Atlantic Corp. v. Twombly*, the Supreme Court clarified that Rule 8(a)(2) requires complaints to contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." 550 U.S. 544, 555 (2007); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Specifically, to survive a motion to dismiss, a complaint must contain enough factual allegations, accepted as true, to state a claim for relief "that is plausible on its face." *Twombly*, 550 U.S. at 570. The issue in considering such a motion is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. *See Neitzke*, 490 U.S. at 327.

## B.    Summary Judgment

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the non-moving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 654 (8th Cir. 2007); *see* Fed.

R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes

that may affect the outcome of the case under the applicable substantive law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material

fact is genuine if the evidence would allow a reasonable jury to return a verdict for

the non-moving party.  *Id*.  "The basic inquiry is whether it is so one-sided that one

party must prevail as a matter of law."  *Diesel Machinery, Inc. v. B.R. Lee

Industries, Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (internal quotation marks and

citation omitted).  The moving party has the initial burden of demonstrating the

absence of a genuine issue of material fact.  *Torgerson v. City of Rochester*, 643

F.3d 1031, 1042 (8th Cir. 2011) (citation omitted).  If the movant does so, "[t]he

nonmovant must do more than simply show that there is some metaphysical doubt

as to the material facts, and must come forward with specific facts showing that

there is a genuine issue for trial."  *Id*. (internal quotation marks and citation

omitted).

### III.  Discussion

#### A.  Motion to Dismiss

Plaintiffs have asserted eight counts in their complaint.  Count 1, brought by

both plaintiffs, asks the Court to preliminarily enjoin Weldon from taking any

action with regard to the funds at issue in this case.  Counts 2-5 are asserted only

by the Plan.  Count 2 is asserted under ERISA and asks for enforcement of the

terms of the plan; Count 3 is for conversion, accounting and restitution; Count 4 is

for unjust enrichment; and Count 5 is for recoupment/money had and received.

Counts 3-5 are asserted under both ERISA and Missouri common law. Counts 6-8

of the complaint are the same as Counts 3-5 but are alleged by Pfizer under

Missouri common law only.

Plaintiffs' complaint asserts that the Plan is "governed exclusively by

ERISA" and that their lawsuit is brought pursuant to ERISA. The parties do not

dispute that the ERISA provision governing plaintiffs' claims is § 502(a)(3), 29

U.S.C. § 1132(a)(3). This section provides:

(a)    A civil action may be brought – […]

    (3)  by a participant, beneficiary, or fiduciary

        (A)  to enjoin any act or practice which violates any provision
            of this subchapter or the terms of the plan, or

        (B)  to obtain other appropriate equitable relief

            (i)  to redress such violations or

            (ii) to enforce any provisions of this subchapter or the
                terms of the plan.

The Supreme Court has construed 29 U.S.C. § 1132(a)(3) to authorize only

"those categories of relief that were typically available in equity." *Sereboff v. Mid*

*Atlantic Medical Services, Inc.*, 547 U.S. 356, 361 (2006). Specifically, the Court

has held that the equitable relief available under this section is narrowly defined as

equitable relief that would have been available in "the days of the divided bench."

*Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002).  In

*Knudson*, the Court noted that for purposes of restitution in equity (as opposed to at

law) a plaintiff could seek to impose a constructive trust or equitable lien on

money or property identified as belonging in "good conscience" to the plaintiff and

that could be clearly traced to particular funds or property in the defendant's

possession.  A court of equity would then order a defendant to transfer title or give

a security interest in the property to the plaintiff, who was considered the true

owner.  However "where the property sought to be recovered or its proceeds have

been dissipated so that no product remains, the plaintiff's claim is only that of a

general creditor" and no equitable lien or constructive trust can be imposed.

*Knudson*, 534 U.S. at 213.  "Thus, for restitution in equity, the action generally

must seek not to impose personal liability on the defendant, but to restore to the

plaintiff particular funds or property in the defendant's possession."  *Id.*

     The Eighth Circuit has similarly upheld application of this legal/equitable

distinction to a claim under ERISA for unjust enrichment.  In *North American

Coal Corp. Retirement Savings Plan v. Roth*, No. A4-03-124, 2004 WL 434150

(D.N.D. Mar. 5, 2004), an ERISA plan and its administrator asserted a claim for

unjust enrichment against former employee Roth after the Plan mistakenly paid

Roth 401K benefits that undisputedly belonged to his former spouse.  The District

court granted plaintiffs' motion for summary judgment, holding that plaintiffs were

entitled to recover the overpayment money.  On appeal, the Eighth Circuit vacated the portions of the district court order that found Roth personally liable and that ordered him to make restitution of a sum certain, noting that these constituted legal remedies not authorized by § 1132(a)(3).  *North American Coal Corp. v. Roth*, 395 F.3d 916, 917 (8th Cir. 2005).

With this foundation, I will address each of Weldon's arguments in turn.

## Count 1 – Injunctive Relief

In their first count, plaintiffs ask for Weldon to be temporarily and preliminarily enjoined from taking any action related to the accounts holding the funds at issue.  Weldon argues this count must fail because it seeks to compel the payment of money.  In addition to Count 1, plaintiffs filed a motion for preliminary injunction but withdrew it before the scheduled injunction hearing.

Because Count 1 seeks only preliminary relief and because plaintiffs, in withdrawing their motion, have indicated their disinterest in pursuing injunctive relief, I will dismiss this Count.  If plaintiffs determine it is necessary to pursue a preliminary injunction at a later time, they may do so via motion.

## Count 2 – Enforcement of the Terms of the Plan

In the second cause of action, the Plan asserts that by accepting and refusing to repay benefits in excess of what she was due under the terms of the plan, Weldon has violated the plan terms and is obligated to reimburse the Plan in the

amount of her overpayments. Weldon argues that this count must be dismissed because it fails to articulate any identifiable cause of action and because there is no specific "repayment" clause in the plan that Weldon violated. I agree.

This count rings very much like a breach of contract claim, but the Plan has not identified a plan provision that requires repayment by Weldon of any benefit overpayments. Although the terms of the plan may be referenced to show that Weldon was overpaid and to determine the amount of the overpayment, without a specific provision requiring repayment, it cannot be alleged that Weldon is violating a plan term. Without this, it is unclear to me, and the Plan has not elucidated, exactly how it would prove an "enforcement of the terms of the plan" count. Additionally, I conclude that the relief requested in this claim is essentially redundant of the relief requested in Counts 3 and 4, which I am not dismissing.

### Count 3 – Conversion, Accounting and Restitution

In Count 3, the Plan asserts an ERISA claim for restitution for the overpayment Weldon received. In its prayer for relief, the Plan asks the court to award it "appropriate equitable relief pursuant to 29 U.S.C. § 1132(a)(3)" including "requiring Weldon to provide an accounting of all uses and expenditures of the overpayment" and ordering restitution to the Plan in the "amount of all Plan benefits that Weldon received in excess of $1,329,455.70." Weldon argues this claim must fail because it seeks to recover a "sum certain from the general assets

of Weldon," which is legal, not equitable, relief and is therefore not allowed by § 1132(a)(3). Weldon also argues that the Plan's claims for restitution and an accounting should be dismissed because plaintiffs have failed to identify any specific fund or property to which the Plan is entitled.

The Eighth Circuit has held that to determine whether a claim for restitution under ERISA is "equitable" or "compensatory" (legal) a court must look to the origin of the relief sought. *Knieriem v. Grp. Health Plan, Inc.*, 434 F.3d 1058, 1061 (8th Cir. 2006). Equitable restitution "seeks to punish the wrongdoer by taking his ill-gotten gains" whereas legal restitution "seek(s) to recover in money the value of the harm done" to the plaintiff. *Id.* As already discussed, the Supreme Court has held that for a restitution claim in equity, a plaintiff may only recover, typically through a constructive trust or equitable lien, the specifically identifiable funds or property (or proceeds thereof) in defendant's possession that belong in good conscience to plaintiff. *See Knudson*, 534 U.S. at 213. Here, the Plan's claim would have been more proper if, as relief, it had requested a constructive trust or equitable lien on identifiable funds, property, or proceeds still in Weldon's possession, but I conclude that the claim survives despite this. In accordance with *Knieriem*, the relief prayed for is framed as the benefit to Weldon, not the harm done to plaintiffs. While the Plan has failed to properly limit its requested relief, it has asked for "appropriate equitable relief" under ERISA. Therefore, instead of

dismissing this count, I conclude that if the Plan is successful on this claim, its relief will be limited to recovery of specifically identifiable overpaid funds (or the identifiable proceeds thereof) still in Weldon's possession and control.

As for Weldon's assertion that the Plan's claim must be dismissed because it has failed to identify the location of the specific funds sought, I conclude that identification of the location of the funds is not necessary at the pleading stage. *See Int'l Foodservice Mfr. Assoc. v. Rustigan*, No. 11 CV 5154, 2012 WL 787613, at *3 (N.D. Ill. Mar. 6, 2012); *J.J. Crewe & Son, Inc. Profit Sharing Plan v. Talbot*, No. CIV.A. ELH-11-2871, 2012 WL 1994778 (D. Md. June 1, 2012); *Chesemore v. Alliance Holdings, Inc.*, 770 F. Supp. 2d 950, 979 (W.D. Wis. 2011).

### Count 4 – Unjust Enrichment

Weldon has argued that the Plan's unjust enrichment claim fails because common law unjust enrichment claims are not permitted in the Eighth Circuit for the recovery of overpaid ERISA benefits.  In their opposition, plaintiffs point out that in *Roth*, 2004 WL 434150, the plaintiffs (a retirement plan and its administrator) sought to recover an overpayment of benefits from the defendant-beneficiary through a claim for unjust enrichment.  The district court granted summary judgment for plaintiff.  *Id*.  On appeal, the Eighth Circuit held that plaintiffs' complaint stated a claim under ERISA.  *Roth*, 395 F.3d at 917.  It

reversed the lower court's decision only as to the monetary award of a sum certain and to the extent it found personal liability as to the defendant. *Id*. at 917-18.

Here, in its unjust enrichment claim, the Plan prays for a judgment: declaring its rightful ownership of any accounts in an amount equal to the amount of the overpayment; declaring that it has an equitable lien against Weldon for the full amount of the overpayment; declaring that a constructive trust exists in its favor in the amount of the overpayment or the identifiable proceeds of that money; directing Weldon to reimburse the Plan for the full amount of the overpayment or turn over any proceeds of the overpayment; and enjoining Weldon from disposing of the overpayment. Some of this relief is clearly legal and some of it is arguably equitable. Because, for purposes of a motion to dismiss, we are to construe the complaint in a light most favorable to the plaintiff, I conclude that the Plan's unjust enrichment claim can reasonably be read as asking for permissible equitable relief. Weldon's motion to dismiss Count 4 is denied except to the extent that if the Plan is successful on this claim its relief will be limited to recovery of any specifically identifiable overpaid funds (or the identifiable proceeds thereof) still in Weldon's possession and control. *See Roth*, 395 F.3d at 917.

## Count 5 – Recoupment/Money Had and Received

As an initial matter, a claim for recoupment, whether an equitable or legal claim, applies in situations where a party seeks to obtain money owed to it by

deducting or offsetting the amounts owed from money it otherwise owes to the other party.  *See, e.g., Reiter v. Cooper*, 507 U.S. 258, 264 (1993).  The doctrine is not applicable here because there is no allegation that the Plan owes Weldon money from which the alleged overpayments could be deducted.

As to the Plan's claim for money had and received, Weldon argues that this is a historically legal claim under common law and therefore not a permissible claim for equitable relief under ¶1132(a)(3).

As state above, the Supreme Court has made clear that the only relief permitted under §1132(a)(3) is relief that was available in equity "in the days of the divided bench."  *US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1544, (2013).  *See also Mertens v. Hewitt Associates*, 508 U.S. 248, 256-57 (1993); *Sereboff*, 547 U.S. at 363.  An action for money had and received, while governed by equitable principles, is an action at law.  *Champ Spring Co. v. United States*, 47 F.2d 1, 3 (8th Cir. 1931).  As such, it is inappropriate here, and Weldon's motion to dismiss Count 5 will be granted.

### State-Law Claims – Counts 3-8

In Counts 3-5, the Plan asserts claims under Missouri common law as an alternative theory to its ERISA claims.  In Counts 6-8 Pfizer asserts the same state-law claims.  I conclude that all of the plaintiffs' state-law claims are preempted.

Before addressing the claims themselves, I note that in their opposition, both plaintiffs aver they have pled state common law claims in alternative to ERISA claims. They state that "[t]o the extent the Court may conclude Plaintiffs have legal remedies available to them under ERISA or the federal common law, Plaintiffs agree their state-law claims are preempted by ERISA." And "to the extent the Court concludes ERISA does not provide a cause of action for Pfizer to recover overpaid benefits from Dr. Weldon, Plaintiffs contend ERISA does not preempt the availability of state-law relief for Pfizer." These statements seem to imply that Pfizer—like the Plan—has asserted claims for the recovery of benefits under ERISA, but I do not see where it is has done so. With the exception of Count 1, none of the claims alleged by Pfizer references § 1132(a)(3). Instead, Pfizer claims to be bringing Counts 6-8 as "alternative claims" under Missouri common law. This is in contrast to the Plan's Counts 3-5, which are alleged both "pursuant to 29 U.S.C. § 1132(a)(3), and alternatively under Missouri state law to the extent not preempted by ERISA." Additionally, the complaint fails to assert, and the plaintiffs carefully avoid conceding in their briefing, whether or not Pfizer is a fiduciary for purposes of § 1132(a)(3).

It is not the Court's role to fashion plaintiffs' claims for them. For the reasons discussed below, I am dismissing Counts 6-8 because they are alleged only

as state-law claims and are preempted.  I have made no determination as to whether Pfizer is a fiduciary because that has been neither alleged nor disputed.

"There are two types of preemption under ERISA: 'complete preemption' under ERISA § 502, 29 U.S.C. § 1132, and 'express preemption' under ERISA § 514, 29 U.S.C. § 1144."  *Prudential Ins. Co. of Am. v. Nat'l Park Med. Ctr., Inc.*, 413 F.3d 897, 907 (8th Cir. 2005). "Complete preemption occurs whenever Congress 'so completely [preempts] a particular area that any civil complaint raising this select group of claims is necessarily federal in character.'" *Id.* (*quoting Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 63-64(1987)).  The comprehensive civil remedies in § 502(a) of ERISA completely preempt state-law remedies. *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004) ("[A]ny state-law cause of action that duplicates, supplements, or supplants ERISA's civil enforcement remedy conflicts with clear congressional intent to make that remedy exclusive, and is therefore preempted."); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52-56 (1987).  "Claims arising under the civil enforcement provision of Section 502(a) of ERISA, 29 U.S.C. § 1132(a), including a claim to recover benefits or enforce rights under the terms of an ERISA plan, implicate…complete preemption." *Neumann v. AT&T Commc'ns, Inc.*, 376 F.3d 773, 779 (8th Cir.2004).

In contrast, ERISA's express preemption clause preempts any state law that "relate[s] to any employee benefit plan." 29 U.S.C. § 1144(a). "Although express

preemption does not allow for automatic removal to federal court, it does provide an affirmative defense against claims not completely preempted under ERISA § 502." *Prudential*, 413 F.3d at 907. A state law "relates to" an employee benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 97 (1983).

If the Plan and Pfizer are fiduciaries, then, as they have acknowledged in their opposition brief (Doc. #15, at 22), their state-law claims are completely preempted by § 1132(a) because they would duplicate, supplement or supplant the ERISA civil enforcement remedy. *See Davila, 542 U.S. at 209; see also Travelers Cas. and Sur. Co. of America v. IADA Servs., Inc*. 497 F.3d 862, 867-68 (8th Cir. 2007) (state-law claims for indemnification, contribution, and restitution brought by party standing in shoes of plan fiduciary were preempted by ERISA).

To the extent Pfizer and the Plan are not plan fiduciaries, their state-law claims are still expressly preempted under § 1144(a) because they relate to an ERISA plan. This express preemption provision "is conspicuous for its breadth." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138 (1990). Its expansive language "was designed to establish pension plan regulation as exclusively a federal concern." *Id*. (internal quotation marks and citation omitted). And it is not limited to "state laws specifically designed to affect employee benefit plans." *Dedeaux*, 481 U.S. at 47-48. A state law relates to an ERISA plan for purposes of

§ 1144(a) "if it [1] has a connection with or [2] reference to such a plan." *California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 324 (1997) (internal citation omitted); *see also Estes v. Federal Express Corp.*, 417 F.3d 870, 872 (8th Cir. 2005) (a state-law claim is preempted where it "premises a cause of action on the existence of an ERISA plan").

The Missouri common laws under which plaintiffs assert claims are of "general application," and "[do] not actually or implicitly refer to ERISA plans." *See Gray v. Fedex Ground Package Sys., Inc.*, No. 4:06-CV-00422 JAR, 2014 WL 4386741, at *2 (E.D. Mo. Sept. 5, 2014).  Therefore, the issue here is whether the state-law claims have a "connection with" an ERISA plan.

The Eighth Circuit has defined several factors to be considered in determining whether a state law has a connection with an ERISA plan. They include whether the state law: (1) negates an ERISA plan provision; (2) affects relations between primary ERISA entities; (3) impacts the structure of ERISA plans; (4) impacts the administration of ERISA plans; (5) has an economic impact on ERISA plans; (6) is consistent with other ERISA provisions; and (7) is an exercise of traditional state power. *Arkansas Blue Cross and Blue Shield v. St. Mary's Hosp., Inc.*, 947 F.2d 1341, 1344–45 (8th Cir.1991); *Gray*, 2014 WL 4386741, at *2.  Courts must look at the totality of the state law's impact on the

ERISA plan, and no one factor is determinative of the pre-emption issue. *Arkansas Blue Cross*, 947 F.2d at 1345.

Here, it is most persuasive that plaintiffs' full recovery of overpaid benefits from Weldon's general assets would be inconsistent with ERISA provisions that place great emphasis on equitable remedies in claims against beneficiaries to enforce plan terms. Additionally, permitting plaintiffs' to bring state-law claims against a beneficiary to recover overpaid benefits would have serious implications for the relationship between primary ERISA entities (the employer/sponsor, the plan, and the beneficiary). Resolution of these claims, whatever that resolution might look like, will also have an economic impact on the Plan. *Cf. American Cleaners and Laundry Co., Inc. v. Textile Processors, et al.*, 482 F. Supp. 2d 1103, 1115 (E.D. Mo. 2007) (employer's unjust enrichment claim against two pension funds to recover mistakenly paid benefits was expressly preempted by § 1144(a)).

In light of all of this, I conclude that even if they are not fiduciaries, the Plan and Pfizer's state-law claims are expressly preempted by ERISA, and Weldon's motion to dismiss these claims will be granted.

### Count 7 – Unjust Enrichment as a Federal Common Law Claim

Pfizer has also argued that it is bringing Count 7 as a claim under federal common law. While Pfizer is correct that the Eighth Circuit has permitted employers to bring federal common law claims against ERISA plans, it has pointed

to no instance in which the Circuit has permitted employers to bring such claims against beneficiaries. I decline to expand the law here.

In *Young America v. Union Cent. Life Ins. Co.*, 101 F.3d 546 (8th Cir. 1996), the Eighth Circuit recognized that an employer has a federal common law action for restitution of mistakenly made payments to an ERISA plan. Although the Eighth Circuit provided no reasoning for its decision, the first case the Court cited as support provides a more thorough explanation of why such an action is permissible. *See UIU Severance Pay Trust Fund v. Local Union No. 18-U, United Steelworkers of Am.*, 998 F.2d 509, 512 (7th Cir. 1993)

In *UIU Severance Pay*, the Seventh Circuit first recognized that the Supreme Court has noted that "'[t]he six carefully integrated civil enforcement provisions found in [§ 1132 of ERISA] provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate separately.'" *Id. quoting Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985). However, the Seventh Circuit went on to hold:

> ERISA permits plan trustees to return to employers payments made to a plan which are the result of a mistake of law or fact, 29 U.S.C. § 1103(c)(2)(A)(i) & (ii), but it does not establish a cause of action by which employers may seek to compel such a refund. Absent a judicially-crafted cause of action, employers are left to the mercy of plan trustees who have no financial incentive to return mistaken payments.

*Id*. at 512-13 (internal citation omitted). As the Seventh Circuit noted, a federal common law action that provides for the return of overpayments made by an employer to a plan simply helps employers enforce an existing ERISA provision that provides for the return of employer overpayments by plans (29 U.S.C. § 1103(c)(2)(A)(i) & (ii)), and which would otherwise be unenforceable by employers. *See also Greater St. Louis Const. Laborers Welfare Fund v. Park-Mark, Inc.*, 700 F.3d 1130, 1135 (8th Cir. 2012) (citing the same ERISA section while acknowledging its recognition of a federal common law cause of action for an employer to recover overpayments to a plan).

There is no such comparable provision providing for the return of overpayments made to beneficiaries. I conclude Pfizer does not have a federal common law unjust enrichment claim against Weldon.

### B.    Motion for Summary Judgment

*Statute of Limitations*

Because all of Pfizer's and many of the Plan's claims are dismissed, I will discuss Weldon's motion for summary judgment only as it relates to the Plan's remaining ERISA claims. The parties do not dispute that a five year statute of limitations applies to the ERISA claims,[2] but they disagree about when plaintiffs'

---

[2] "Because ERISA does not contain a statute of limitations, the court borrows the most analogous state statute of limitations." *Administrative Committee of Wal-Mart Stores, Inc. v. Soles*, 336 F.3d 780, 785 (8th Cir. 2003). Here, plaintiffs' claims are most analogous to a claim of unjust

claims accrued.  Because disputed issues of material fact remain as to the time of

accrual, Weldon's motion for summary judgment based on the statute of

limitations is denied.

In a federal question case, absent a contrary mandate from Congress, the

"discovery rule" is used to determine when a cause of action accrues.  *Comcast of*

*Illinois X v. Multi-Vision Elec., Inc.*, 491 F.3d 938, 944 (8th Cir. 2007); *Union Pac.*

*R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir. 1998).  Under the discovery rule, a

cause of action accrues when the plaintiff "discovers, or with due diligence should

have discovered, the injury that is the basis of the litigation." *Admin. Comm. of the*

*Wal-Mart Stores, Inc. v. Soles*, 336 F.3d 780, 786 (8th Cir. 2003).

Based on the factual record currently before me, it appears that plaintiffs

obtained actual knowledge of their injury no later than September 2009, less than

five years before they filed this case.  Weldon, however, argues that plaintiffs'

federal law claims are barred because, with the exercise of due diligence, plaintiffs

should have discovered the overpayments much earlier.[3]

---

enrichment or money had and received, which are each governed by a five-year statute of
limitations.  *See Carpenter v. Countrywide home Loans, Inc.*, 250 S.W.3d 697, 703 n.5 (Mo.
2008)(money had and received); *Royal Forest Condominium Owners' Ass'n v. Kilgore*, 416
S.w.3d 370, 373 (Mo. Ct. App. 2013) (unjust enrichment); *Pitman v. City of Columbia*, 309
S.W.3d 395, 405 (Mo. Ct. App. 2010) (both).

[3] Plaintiffs have argued that Weldon's motion should fail automatically because due diligence is
a question of fact for a jury.  They are correct that generally, "in a statute of limitations context
… a plaintiff's due diligence [is a question] of fact unsuited for summary judgment." *Hines v.
A.O. Smith Harvestore Products, Inc.*, 880 F.2d 995, 999 (8th Cir. 1989) (applying Missouri

First, Weldon contends it is plaintiffs' burden to prove that even with the exercise of reasonable diligence, they should not have known of their injury before the date of actual discovery in 2009. In support of this, she relies primarily on *Cathedral of Joy Baptist Church v. Village of Hazel Crest,* 22 F.3d 713, 717 (7th Cir. 1994). In *Cathedral of Joy*, the Seventh Circuit, ruling on opposing motions for summary judgment, determined that the federal discovery rule is an exception to the standard accrual rule and used this as the basis for allocating the burden of proof to plaintiff. *Id*. at 717. In this way, the Seventh Circuit essentially treated the discovery rule as a means for tolling the "standard" accrual rule.

None of the parties here have cited, and I have been unable to discover, a case in which the Eighth Circuit explicitly states which party has the burden of proof on a motion for summary judgment brought by a defendant who is asserting a statute of limitations defense using the discovery rule. But it is notable that the Eighth Circuit treats the discovery rule not as an exception to the standard accrual rule (akin to tolling), but rather as the primary accrual rule in federal question cases. *See, e.g., Comcast of Illinois X*, 491 F.3d at 944; *Union Pac. R. Co.*, 138 F.3d at 330. Furthermore, in a summary judgment motion, the moving party has the initial burden of demonstrating the absence of a genuine issue of material fact.

---

discovery rule). However, "[w]here the evidence leaves no room for reasonable minds to differ on the issue…the court may properly resolve the issue as a matter of law." *Klehr v. A.O. Smith Corp.*, 87 F.3d 231, 235 (8th Cir. 1996) (applying Minnesota state discovery rule) citing *Miles v. A.O. Smith Harvestore Products, Inc.*, 992 F.2d 813, 817 (8th Cir. 1993) (same).

*Torgerson*, 643 F.3d at 1042. In light of this, I conclude that it is Weldon's burden to show that there was no material dispute of fact as to when plaintiffs' should have discovered their claims, and she has failed to carry this burden.

Weldon asserts that the plaintiffs' overpayment mistake should have been discovered when the first overpayment was made. In support of this she cites *Verizon Employee Benefits Committee v. Heinlein*, Civil No. WDQ-06-3022 (D. Maryland Apr. 2, 2007), in which the District of Maryland held, under Maryland's discovery rule, that if a party has "the information necessary to determine the overpayment at the time the overpayment was made" then the statute of limitations begins to accrue on that date. *Id.* The factual circumstances of *Heinlein,* and the extent to which the plaintiff in that case possessed the "necessary" information were not included in the Court's opinion. As a result, I cannot compare that case with the facts of this case. However, I conclude that here, although plaintiffs may have been authorized to access information regarding the overpayments, there remains a disputed issue of fact as to whether "due diligence" on plaintiffs' part would have led to discovery of the overpayments. This is particularly so because, based on the terms of the Outsourcing Services Agreement, the "necessary" information was in Fidelity's, not plaintiffs', day-to-day control.

Next, Weldon argues that the overpayment mistakes should have been discovered when she called the help line in February 2006 to inquire about her

ongoing payments or when Fidelity conducted internal audits it was contracted to perform in 2006, 2007, and/or 2008.[4]  She asserts that the knowledge held by Fidelity as a result of the phone call and the hypothetical audits can be imputed to plaintiffs because at all times Fidelity was acting as plaintiffs' agent.  Weldon is correct that "[f]or purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal." Restatement (Third) Of Agency § 5.03 (2006).[5]  However, whether Fidelity was actually plaintiffs' agent remains a disputed issue of fact.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) Of Agency

---

[4] There is no evidence that Fidelity actually performed these audits.  Even though it is six years since plaintiffs became aware of the overpayments, they have been unable to track down audit files.

[5] Neither party discussed whether federal common law or Missouri common law applies for purposes of determining whether Fidelity was plaintiffs' agent, but I will apply federal common law of agency as the circuit courts have held this to be proper in the ERISA context.  *See, e.g., Anderson v. Int'l Union, United Plant Guard Workers of Am.*, 150 F.3d 590, 592-93 (6th Cir. 1998) (addressing an agency issue under ERISA and holding that "we are guided by the law of agency as developed and interpreted as a matter of federal common law"); *Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 988 (3d Cir. 1995); *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 n.15 (7th Cir. 1998) (applying federal law of agency in ERISA context and noting other courts that have done same).  Federal common law generally relies on the Restatement of Agency.  *See Golan v. Veritas Entm't, LLC*, No. 4:14CV00069 ERW, 2014 WL 1347283, at *4 (E.D. Mo. Apr. 4, 2014); *Moriarty*, 155 F.3d at 866 n.15.

§ 1.01 (2006); *see also S. Pac. Transp. Co. v. Cont'l Shippers Ass'n, Inc.*, 642 F.2d 236, 238 (8th Cir. 1981) ("[a]gency is a legal concept that depends upon the existence of certain factual elements: (1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) the understanding of the parties that the principal is to be in control of the undertaking").

In arguing that Fidelity was plaintiffs' agent, Weldon notes only that Fidelity was contracted to perform various tasks pursuant to the Outsourcing Services Agreement and asserts that therefore it "undisputedly had actual and apparent authority to carry out virtually every aspect of the Plan's administration." These conclusory statements are not enough to establish that Fidelity was plaintiffs' agent. The Agreement states that Fidelity would perform its services "within the framework of Plan provisions, guidelines and interpretations" as conveyed by Pfizer to Fidelity. It states Fidelity would have "no discretionary authority or power to make any decisions as to plan policy, interpretations, practices or procedures…." However, it also mandates that the "manner and means of performing the Services" would be within Fidelity's exclusive control. It states that the parties expressly deny, and that the agreement is not intended to create, a relationship of principal and agent between Pfizer and Fidelity.

The characterization of a relationship as agency (or not agency) in an agreement between parties is not controlling. Restatement (Third) Of Agency § 1.02. Rather, whether an agency relationship exists depends on "an assessment of the facts of the relationship and the application of the law of agency to those facts." *Id*. at cmt. a. Here, there remain disputed issues of fact as to whether the parties "manifested assent" to an agency relationship and to what degree Pfizer exercised control over Fidelity's services. These are indispensable elements of an agency relationship. As a result, I find that Weldon has failed to carry her burden on this record to prove the existence of a principal/agent relationship between plaintiffs and Fidelity.

In light of the above, Weldon's motion for summary judgment based on the statute of limitations as to plaintiffs federal law claims is denied.

### *Laches*

Finally, Weldon argues that plaintiffs' claims should be dismissed because they are barred by the doctrine of laches. The equitable defense of laches applies when a plaintiff's unreasonable delay in bringing an action prejudices a defendant. *Strawn v. Missouri State Bd. of Educ.*, 210 F.3d 954, 956 n. 3 (8th Cir.2000). "There are two kinds of prejudice which might support a defense of laches: (1) the delay has resulted in the loss of evidence which would support defendant's position; or (2) the defendant has changed his position in a way that would not

have occurred if plaintiff had not delayed." *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 809 n. 17 (8th Cir.1979); *Baker v. Veneman*, 256 F. Supp. 2d 999, 1007 (E.D. Mo. 2003). Mere passage of time, without inexcusable delay and injury, is insufficient to constitute laches. *Gilbert/Robinson, Inc. v. Carrie Beverage–Missouri, Inc.*, 758 F.Supp. 512, 525 (E.D. Mo.1991). "[W]hen applying laches to an equitable claim, courts apply a presumption that the action is not barred if brought within the statute of limitations period for 'analogous' actions at law. *Ashley v. Boyle's Famous Corned Beef Co.*, 66 F.3d 164, 169 (8th Cir. 1995); *see also Jackson v. United States*, No. 1:07CV00034 ERW, 2008 WL 2952501, at *3 (E.D. Mo. July 29, 2008).

As discussed above, there is a dispute of fact with regard to the relationship between plaintiffs and Fidelity and whether Fidelity's knowledge may be imputed to plaintiffs. As a result, there remains a disputed issue of material fact as to when plaintiffs should have discovered their claims and the reasonableness of their delay in bringing this lawsuit. Because a disputed issue of fact remains on this point, Weldon's motion for summary judgment on the basis of laches is denied.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss [#9] is **GRANTED** as to Counts 1, 2, 5, 6, 7, and 8 of plaintiff's complaint and **DENIED** as to Counts 3 and 4 of plaintiff's complaint.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment [#54] is **DENIED**.

By separate order this case is set for a Rule 16 scheduling conference. The parties should modify their proposed plan as appropriate based on the discovery already completed, and should provide dates only for those things necessary to prepare this case for final resolution.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 24th day of August, 2015.